UNITED STATES of America, Appellee,

v.

Michael Lee MATTHEWS and Robert
G. Prater, Defendants–Appellants.

Nos. 509, 228, Dockets 93–1158, 93–1172.

United States Court of Appeals,
Second Circuit.

Argued Dec. 1, 1993.

Decided March 30, 1994.

Bernard J. Malone, Jr., Asst. U.S. Atty., Albany, New York (Gary L. Sharpe, U.S. Atty. for the N.D. of N.Y., Syracuse, NY, on the brief), for appellee.

David A. Lewis, New York City (The Legal Aid Soc., Federal Defender Services Unit, on the brief), for defendant-appellant Michael Lee Matthews.

Richard L. Mott, Albany, NY for defendant-appellant Robert G. Prater.

Before: KEARSE and JACOBS, Circuit Judges, and CARTER, District Judge.*

KEARSE, Circuit Judge:

Defendants Michael Lee Matthews and Robert G. Prater appeal from judgments entered in the United States District Court for the Northern District of New York, following a jury trial before Howard G. Munson, *Judge,* convicting each of them on one count of bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (b) (1988), and one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371 (1988). Matthews was sentenced principally to 135 months' imprisonment on the robbery count and 60 months' imprisonment on the conspiracy count, to be served concurrently, followed by a three-year term of supervised release. Prater was sentenced principally to 108 months' imprisonment on the robbery count and 60 months' imprisonment on the conspiracy count, to be served concurrently, followed by two concurrent three-year terms of supervised release. Each defendant was ordered to pay $37,570 in restitution. On appeal, Matthews raises constitutional challenges to the admission of certain evidence against him; Prater challenges the sufficiency of the evidence to convict him and raises various claims of trial error; and both defendants contend that the district court erred in calculating their sentences. For the reasons below, we reject defendants' challenges to the conduct of trial but find merit in their sentencing claim. Accordingly, we vacate the judgments and remand for resentencing.

## I. BACKGROUND

On November 8, 1991, at approximately 10:16 a.m., three masked men, armed with what appeared to be handguns, entered a bank in Schenectady, New York. The robbers ordered the customers and tellers to lie on the floor and threatened to shoot those who did not obey. Two of the robbers vaulted the tellers' counter and took more than $37,500 from the cash drawers. The men left the bank less than two minutes after they entered.

In February 1992, Matthews and Prater were arrested and charged with the robbery and with conspiracy to commit the robbery.

### A. *The Government's Case*

The government's evidence at trial included the testimony of several bank customers and employees who were in the bank during the robbery; the testimony of a witness who, shortly after the robbery, saw three men hurriedly jettison their outer clothing and change vehicles; the testimony of several law enforcement officers who investigated the robbery; and the testimony of Prater's former girlfriend, who in December 1991 had given information to a policeman in Syracuse, New York, which first led the authorities to focus on Prater and Matthews. Taken in the light most favorable to the government, the evidence was as follows.

Bank customer John Donnelly, who entered the bank from its parking lot shortly before the robbery, had walked past a vehicle he described as a light-colored, four-door, mid-sized car, which was backed up to the bank next to the entrance. Three men were in the car; the man in the driver's seat and at least one of the other two were black. Donnelly got a 5–10–second look at the man who occupied the driver's seat. Donnelly then entered the bank and was inside when the robbers entered. He testified that through the holes in one robber's mask, he could see that that robber was black. Prior to trial, Donnelly viewed a photographic array and selected a picture of Matthews as the man he had seen in the driver's seat of the car; he also identified Matthews at trial.

Mary Ellen Jacobson, a pedestrian passing through the bank's parking lot two minutes before the robbery, testified that she walked by a four-door beige car with maroon accents, an "older, Chevrolet type," backed up to the bank. Inside were a man in the driver's seat and an indeterminable number of people in the back seat. Jacobson was particularly aware of the car because it was

---

* Honorable Robert L. Carter, of the United States District Court for the Southern District of New York, sitting by designation.

the only one facing out from the bank and the only one with its motor running. Alert to whether or not it was safe for her to walk in front of it, she looked at the driver. At trial, she identified Matthews as the driver.

Shortly after the robbery, William Barnes, general manager of a supermarket less than a mile from the bank, saw a brown or tan car drive into the supermarket parking lot and park next to a black or dark-colored pickup truck. Barnes saw three black men get out of the car and hurriedly take off some clothes and toss them into the weeds along the side of the lot. The three men then jumped into the truck and sped away. Barnes noted the truck's license plate number as HD3608 and called the police. At trial, Barnes identified Matthews as a passenger in the car.

The police traced the HD3608 license plates to a bright yellow truck whose whereabouts were accounted for on the day of the robbery. However, a dark truck matching the description given by Barnes was registered to Matthews's wife. Its license plate number was HD2608.

The police recovered from the weeds the discarded clothing, a ski mask, and a toy gun resembling a .9mm pistol. They determined that the car in which Barnes had seen the men arrive, a tan Chevrolet Citation, had been stolen less than 24 hours before the robbery from a parking lot located a mile from the bank. A fingerprint and a palm print taken from the door of the Citation were eventually identified as belonging to Prater.

The government's primary witness was Victoria Dunbar, with whom Prater had lived in Syracuse off and on from June 1991 until Christmas 1991. Dunbar testified that around November 11, 1991, Prater "told me that him and Mike Matthews had robbed a bank, him and Mike [M]atthews and Artiste and he had told me it was an out-of-town bank." (Trial Transcript ("Tr:") 625.) Dunbar testified, Prater "told me that they went out of town, robbed a bank, him and Mike Matthews had guns, he had a pistol and Artiste had a pistol." (Id.) "That is what he said. Mike had the rifle and Mike stayed on the other side of the counter of the teller and Bobby [Prater] and Artiste went behind the counter." (Id. 626.) "Bobby had on black sweatpants and a black sweatshirt. He had a mask on his head, on his face. They all wore masks." (Id.) "[A]fter they got what they wanted, they left the bank, they backed out of the bank with their guns so won't nobody push no buttons or anything. They went, they had rented a car. They got in the car, drove it to where the truck was, because they had, Mike had hid his truck, drove it to where the truck was...." (Id. 627.) Dunbar testified that Prater did not tell her in what city the robbery had occurred.

Dunbar had not immediately reported Prater's statements to the authorities. On Christmas Day, however, after Prater got into a violent argument with Dunbar and the father of her children, she called the police to have Prater removed, and she reported Prater's November 11 statements to one of the policemen who responded to her call.

In addition, the government introduced the testimony of Matthews's father-in-law, who said he had seen Matthews and Prater together on four or five occasions in the summer and fall of 1991 and that the two had worked together. There was also evidence that though Matthews and Prater were residents of Syracuse in 1991, Matthews had previously lived in the home of one Emma Gibson in Schenectady a half-mile from the bank and had been employed just one block from the bank; that Matthews and Prater had been in Schenectady in the summer of 1991; and that Matthews told his parole officer he had visited Gibson in Schenectady in early November 1991.

## B. The Defense

Both defendants denied that they were the robbers, and they presented evidence that they had not been in Schenectady on November 8, 1991. Matthews testified that he had been at home in Syracuse, which is some 140 miles from Schenectady, on that day. His testimony was corroborated by two witnesses. His close friend Viodelda Harris testified that he was with her in the black pickup truck in Syracuse on the day of the robbery. Matthews's wife also testified that Matthews had been in Syracuse on that day.

Prater, who did not testify, sought to show that he had been in Buffalo, which is some 285 miles from Schenectady, at the time of the robbery. Mary Garlington, who lived in Buffalo and was the grandmother of Prater's son, testified that at about noon on November 8 she had called her home trying to reach her son. She testified that Prater had answered the phone, and that she had conversed with him. Garlington testified that Prater was also at her house when she returned home from work that evening. Prater's father testified that at his home in Syracuse on November 10, he had received a collect call from Prater from Buffalo. Telephone company records indicated that Prater's father had indeed received a collect call from Buffalo on November 10.

Prater also sought to show, through cross-examination of Dunbar, that her testimony that Prater told her he had robbed a bank was a complete fabrication. He elicited some uncertainty as to her recollection of the date on which Prater told her of his robbery, and hence uncertainty as to the date of the robbery to which he referred. He also brought out that Dunbar had told the police that the robbery had taken place in Buffalo, Rochester, or Auburn, New York. In addition, as discussed in Parts II.B.2. and II.B.3., Prater attacked Dunbar's character and sought to show that the reason Dunbar had fabricated her story was that, although she loved Prater and wanted to marry him, her love was unrequited. Thus, Prater accused Dunbar of being "a jilted woman" (Tr. 680) whom Prater had left for another woman (the mother of his child).

## C. The Verdicts and Sentences

The jury returned verdicts convicting Matthews and Prater of robbing the Schenectady bank and of conspiring to commit that robbery, as charged. As discussed in Part II.C. below, in calculating defendants' sentences under the federal Sentencing Guidelines ("Guidelines"), the district court increased their offense levels by four steps in connection with their use, during the robbery, of "dangerous weapons," as defined by Guidelines § 1B1.1 Application Note 1(d). Defen-

dants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

Matthews contends principally that he is entitled to a new trial on the grounds that the admission against him of Dunbar's testimony as to Prater's out-of-court statements violated the Confrontation Clause of the Constitution and that the admission of the in-court identifications by Barnes and Jacobson violated the Due Process Clause. Prater asserts a number of trial errors and contends that the evidence was insufficient to support his conviction on either count. Both defendants challenge the four-step offense-level enhancement for weapons use. For the reasons below, we find ground for relief only in the sentencing contention.

### A. Matthews's Constitutional Claims

#### 1. The Admission of Prater's Hearsay Statements

Matthews contends that the admission at trial of Dunbar's testimony concerning Prater's out-of-court statements that Matthews had participated in the robbing of a bank violated Matthews's rights under the Confrontation Clause. The government contends that the testimony did not violate Matthews's confrontation rights because it was admissible under the hearsay exception for statements against penal interest or because it was inherently reliable. We find merit only in the government's latter contention.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Despite its absolute language, this provision "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial," Maryland v. Craig, 497 U.S. 836, 847–48, 110 S.Ct. 3157, 3164, 111 L.Ed.2d 666 (1990), provided that (1) the declarant is "unavailable" to testify, and (2) the statement "bears adequate 'indicia of reliability,'" Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); see also Idaho v. Wright, 497 U.S.

805, 814–15, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638 (1990).

■ The unavailability of the declarant may occur in any of a number of ways. A declarant who invokes his Fifth Amendment privilege against self-incrimination and refuses to testify at trial is unavailable for purposes of Confrontation Clause analysis. *See, e.g., United States v. Bakhtiar,* 994 F.2d 970, 977 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993); *United States v. Beltempo,* 675 F.2d 472, 480 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982); *see also* Fed. R.Evid. 804(a). There is no question that the unavailability condition was met here, for Prater exercised his Fifth Amendment right not to testify at trial.

■ Whether the statement "bears adequate 'indicia of reliability' " is a more complex question. If the statement falls within a firmly rooted hearsay exception, it is presumed to be "so trustworthy that adversarial testing would add little to [its] reliability." *Idaho v. Wright,* 497 U.S. at 821, 110 S.Ct. at 3149. Thus, the admission of a statement falling within such an exception does not violate the Confrontation Clause. *See, e.g., Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965) (dying declarations); *Mattox v. United States,* 146 U.S. 140, 151, 13 S.Ct. 50, 53–54, 36 L.Ed. 917 (1892) (same); *Mancusi v. Stubbs,* 408 U.S. 204, 213–16, 92 S.Ct. 2308, 2313–15, 33 L.Ed.2d 293 (1972) (cross-examined testimony from prior trial); *see also Bourjaily v. United States,* 483 U.S. 171, 182–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987) (principle that statements of coconspirators in furtherance of conspiracy are not excluded by hearsay rule is firmly rooted).

■ If the statement does not fall within a firmly rooted hearsay exception, there is a presumption against its trustworthiness. The presumption may be overcome, though no one factor is dispositive. In general, such a statement must be excluded unless the totality of the circumstances surrounding the making of the statement provides such " 'particularized guarantees of trustworthiness' " that the court can conclude that "adversarial testing would add little to its reliability." *Idaho v. Wright,* 497 U.S. at 821, 110 S.Ct. at 3149. If that level of trustworthiness is shown, admission of the statement does not violate the Confrontation Clause.

■ There is some question as to whether the exception to the hearsay rule for statements against penal interest, *see* Fed.R.Evid. 804(b)(3), is a "firmly rooted" exception. *Compare United States v. Katsougrakis,* 715 F.2d 769, 776 (2d Cir.1983) (suggesting that statements against penal interest may "fall within a 'firmly rooted hearsay exception' "), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), *with United States v. Bakhtiar,* 994 F.2d at 977–78 (suggesting that more recent cases in the Supreme Court and other Circuits have cast doubt on whether penal-interest exception is firmly rooted). *See, e.g., Lee v. Illinois,* 476 U.S. 530, 544 n. 5, 106 S.Ct. 2056, 2064 n. 5, 90 L.Ed.2d 514 (1986) ("We reject respondent's categorization of the hearsay involved in this case [a stationhouse confession] as a simple 'declaration against penal interest.' That concept defines too large a class for meaningful Confrontation Clause analysis."); *United States v. Flores,* 985 F.2d 770, 775–76 & n. 13 (5th Cir.1993). The difficulty is that if the statement against penal interest is multi-faceted, its facets may not be uniformly trustworthy. So much of a statement as simply implicates the declarant in a crime is generally trustworthy, for "people do not ordinarily make statements damaging to themselves unless they are true." *United States v. Bakhtiar,* 994 F.2d at 978. However, to the extent that the declarant's statement implicates another person in the crime, it may in some circumstances constitute an attempt to minimize the declarant's own culpability, or to shift blame to another, or to curry favor with authorities. *See, e.g., Lee v. Illinois,* 476 U.S. at 544–45, 106 S.Ct. at 2064–65; *United States v. Bakhtiar,* 994 F.2d at 978; *United States v. Katsougrakis,* 715 F.2d at 776.

■ Thus, ordinarily, " 'a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption.' " *Lee v. Illinois,* 476 U.S. at 541–

42, 106 S.Ct. at 2062 (quoting *Dutton v. Evans,* 400 U.S. 74, 98, 91 S.Ct. 210, 224, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring)). On the other hand, if the statement is made to a person whom the declarant believes is an ally rather than a law enforcement official, and if the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant, the trustworthiness of the portion that inculpates the defendant may well be sufficiently established that its admission does not violate the Confrontation Clause. *See, e.g., United States v. Bakhtiar,* 994 F.2d at 978; *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir. 1987) (trustworthiness indicated in part by fact that even portion that inculpated defendant was against the declarant's penal interest); *United States v. Katsougrakis,* 715 F.2d at 776 (trustworthiness shown by lack of any "persuasive showing that [the declarant] had an ulterior motive when conversing with his friend").

■ In the present case, we are persuaded that the trustworthiness condition was met, given the circumstances and content of Prater's statements. The statements were not made to law enforcement authorities, were not made in response to questioning, and were not made in a coercive atmosphere. Rather, they were volunteered by Prater to his girl-friend, an intimate and confidante, in the private recesses of their home. There were no coercive pressures, and there was no attempt to curry favor with authorities. Indeed, when he made the statement to Dunbar, Prater had no reason to expect that his admission would ever be disclosed to the authorities.

Further, the statements do not reflect any attempt by Prater to minimize his own culpability. Rather, Prater implicated himself in all aspects of the robbery. He admitted that he entered the bank, that he carried a gun, and that he went behind the counter to seize the money. Nor was there any effort to make Matthews seem more culpable than Prater. Prater said that Matthews had held a gun on the bank employees and patrons while Prater and the third robber went behind the counter. In every material detail of Prater's statement, Matthews and Prater were equally culpable. We see nothing in the contents of the statements or in the circumstances in which they were made to cause suspicion that only the portions of Prater's statements that dealt with his own actions were trustworthy.

Matthews's counsel urges us to find the portions of Prater's statements implicating Matthews untrustworthy on the hypothesis that they might have been fabricated because Prater knew that Dunbar would disapprove of his robbing a bank, but knew that Dunbar liked Matthews. Thus, counsel suggests, Prater may have had a motive falsely to include Matthews's name when telling Dunbar of the robbery, so as to make the enterprise seem more respectable. We regard this argument as fanciful. First, the record does not indicate that Dunbar had moral, as opposed to pragmatic, compunctions against such a robbery, as she (a) admitted to having committed larcenies herself, and (b) testified that in an earlier conversation with Prater, "he was talking about robbing a bank and I told him no because he might get caught...." (Tr. 624.) Second, even assuming that Dunbar would have disapproved of Prater's participation in a robbery for which he was not caught, it hardly seems likely that Prater would have chosen counsel's hypothetical method to escape Dunbar's disapproval, rather than simply not telling her about the robbery at all. In short, the scenario posed is implausible and does not undermine our confidence in the reliability of Prater's statement as to Matthews's participation in the robbery.

Given the totality of the circumstances as to the content and context of Prater's statements, we conclude that those statements had sufficient "particularized guarantees of trustworthiness" that their admission against Matthews did not violate Matthews's rights under the Confrontation Clause.

## 2. *In-Court Identifications*

■ At trial, Donnelly, Barnes, and Jacobson identified Matthews as one of the men they had seen in the tan Citation. Don-

nelly had also selected Matthews's picture prior to trial from a photographic array, and his identifications are not contested on appeal. Jacobson, shown a photo array before the authorities had been led to Matthews, had been presented only with an array that did not include his picture; she had said one of the photos looked somewhat like the man she had seen but she could not say that the photo was of that man. Barnes had been shown an array that included a picture of Matthews but had failed to recognize him. In light of the lack of any pretrial identifications by Barnes or Jacobson, Matthews contends that their in-court identifications, when he and Prater were sitting at the counsel table and were the only black males in the courtroom, possessed no indicia of reliability and that the circumstances were tantamount to a showup that rendered the identifications so unreliable as to violate fundamental fairness. We find no basis for reversal.

■■■ Generally if identification procedures used prior to trial were not unduly suggestive, questions as to the reliability of a proposed in-court identification affect only the identification's weight, not its admissibility. *See, e.g., Foster v. California,* 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed.2d 402 (1969). It is true, of course, that the circumstances at trial may themselves be tantamount to a showup, and the trial court has discretion to take steps to avoid any unfairness in the in-court identification. *See, e.g., United States v. Archibald,* 734 F.2d 938, 941–43 (2d Cir.), *modified,* 756 F.2d 223 (2d Cir.1984); *United States v. Brown,* 699 F.2d 585, 594 (2d Cir.1983). The court is not required, however, to take such steps *sua sponte.* It is incumbent upon the defendant to ask, for example, to be seated somewhere other than at the counsel table, or not to be present, or to be placed in a lineup prior to the in-court identification. *See, e.g., Jarrett v. Headley,* 802 F.2d 34, 45 (2d Cir.1986); *Boyd v. Henderson,* 555 F.2d 56, 61–62 (2d Cir.), *cert. denied,* 434 U.S. 927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977); *United States v. Brown,* 699 F.2d at 594. There may, however, be sound tactical reasons for defense counsel not to make such a request, given "the apparent weakness of this kind of identification," *Brathwaite v. Manson,* 527

F.2d 363, 367 n. 6 (2d Cir.1975), *rev'd on other grounds,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Where the witnesses have had a sufficient opportunity to view the person who was engaged in the commission of the crime, counsel may well deem it preferable not to chance bolstering the in-court identification of his client in any way, permitting counsel to argue to the jury that the in-court identification was inherently weak. *See generally Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.")

■■■ In any event, where the circumstances of either a pretrial or an at-trial identification are suggestive, reliability is the linchpin for determining admissibility. *See id.* at 106–07 n. 9, 114, 97 S.Ct. at 2249 n. 9, 2253. Even an identification at trial under circumstances that are tantamount to a showup is "not per se inadmissible, but rather depend[s] upon the 'totality of the circumstances.'" *United States v. Archibald,* 734 F.2d at 942.

In the present case, Matthews was not advised prior to trial that Jacobson or Barnes would attempt to make in-court identifications; apparently he was, however, given a witness list that included their names, knew that more than one witness had seen the robbers in the bank's parking lot, and knew that one witness had seen the robbers discard evidence and change vehicles in another nearby parking lot. Matthews did not request any advance procedural measures to reduce the likelihood of an unreliable in-court identification. Further, when the government questioned Jacobson, and thereafter when it questioned Barnes, as to whether or not they, respectively, saw in the courtroom any of the men they had seen in the car, Matthews's attorney chose not to object but allowed the witness to answer without interruption and allowed the government to elicit the identifications of Matthews. Counsel made no effort to launch any sort of preliminary inquiry of these witnesses as a precondition to an actual identification. Only after

hearing the witnesses' unobjected-to identifications and cross-examining the witnesses did counsel make any objection, or seek a *Wade*-type hearing (*see United States v. Wade,* 388 U.S. 218, 239–41, 87 S.Ct. 1926, 1939–40, 18 L.Ed.2d 1149 (1967)) outside the presence of the jury, or move to suppress the identifications.

Further, in both cross-examination and the hearing that was eventually requested, Matthews was unable to show that the ability of Barnes or Jacobson to identify him at trial was the product of the pretrial photo arrays they had been shown or of the circumstances at trial. Rather, the testimony of each witness revealed that each had been particularly aware of the robbers' car and had had ample opportunity to see at least one of the men in it. Their testimony was thus sufficient to establish that their identifications had an origin independent of their viewing Matthews in the courtroom and hence was sufficient to meet the threshold of reliability needed to permit them to attempt in-court identifications of the men they had seen. Any further question of reliability was a matter for argument to, and assessment by, the jury.

## B. *Prater's Trial Contentions*

Prater contends that he is entitled to a judgment of acquittal because the evidence was insufficient to support his conviction. Alternatively, he contends that he is entitled to a new trial on the grounds, *inter alia,* (a) that the trial court erred in admitting evidence of other acts and evidence not provided to him as required by Fed.R.Crim.P. 16(a)(1)(A), and (b) that the government's summation was unfair. We find no basis for reversal.

### 1. *The Sufficiency of the Evidence*

Prater challenges the sufficiency of the evidence to support his conviction on either count, arguing that the evidence at most supported the conclusion that Prater had robbed or conspired to rob a bank in some city other than Schenectady, and that he was convicted merely because of his association with Matthews. These arguments might be more persuasive if the only evidence against Prater were the testimony of Dunbar, who testified that Prater told her in Syracuse that he had robbed a bank in another city but had not identified the city as Schenectady, or if there were no evidence other than Prater's friendship with Matthews. In light of the record as a whole, however, Prater's contentions are meritless.

In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. In reviewing such a challenge, we must view the evidence, whether direct or circumstantial, in the light most favorable to the government, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993); *United States v. Sumnicht,* 823 F.2d 13, 15 (2d Cir.1987), crediting all inferences that could have been drawn in the government's favor, *see United States v. Gordon,* 987 F.2d at 906; *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *See, e.g., United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Pieces of evidence must be viewed not in isolation but in conjunction, *see, e.g., United States v. Brown,* 776 F.2d 397, 403 (2d Cir. 1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and we must affirm the conviction so long as, from the inferences reasonably drawn from the record as a whole, the jury might fairly have concluded that the defendant was guilty beyond a reasonable doubt, *see United States v. Skowronski,* 968 F.2d 242, 247 (2d Cir.1992); *United States v. Sumnicht,* 823 F.2d at 15. The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,*

490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989).

Prater has not met his burden here. Though his known association with Matthews prior to and during the fall of 1991 was not irrelevant, it was hardly the sole basis for connecting Prater with the robbery in Schenectady. The circumstantial evidence showed that the robbers had used the tan Chevrolet Citation, stolen the day before, as their getaway car. Several witnesses observed the car backed virtually to the door of the bank with its motor running just before the robbery. Shortly after the robbery, Barnes saw the car speed into the supermarket lot and saw the robbers hurriedly jettison evidence and change vehicles. The jury could reasonably connect Prater with these events because his finger-prints and palm print were found, respectively, on and in the getaway car.

Since the owner of the getaway car did not know Prater, it was to be inferred that Prater had been in the car after it was stolen. And since the car was stolen less than 24 hours before the robbery and was abandoned minutes after the robbery, the inference was strong that it had been stolen in connection with the robbery. Thus, there was no apparent explanation for Prater's fingerprint in the getaway car that would have been consistent with his innocence.

Further, the evidence indicated that the vehicle that the robbers had readied for the remainder of their getaway was the truck possessed by Matthews. Matthews's truck matched the description of the one in which Barnes had seen the robbers speed away, and its license plate was a near-perfect match of the six-digit license plate number Barnes had noted. Given all of this evidence, together with Dunbar's testimony that Prater told her he had robbed a bank, and the fact that Prater's description of the robbery to Dunbar was entirely consistent with the description given by bank patrons and employees and with the event as recorded on the Schenectady bank's surveillance cameras, the proof was ample to connect Prater with the robbery of that bank. Any uncertainty in Dunbar's testimony was a matter for argument to the jury, not a basis for finding the evidence insufficient as a matter of law.

2. *The Failure To Provide Rule 16(a) Material*

In attempting to show that Dunbar's testimony against Prater was a vindictive figment of unrequited love, Prater's attorney elicited on cross-examination of Dunbar that she had told Prater she wanted to marry him. He also introduced envelopes in which Dunbar had sent letters to Prater two months before trial; the envelopes bore a lipsticked imprint of lips and the words "sealed with a kiss." Counsel attempted to get Dunbar to admit that Prater had left her because he disapproved of her lifestyle and because he wanted to be with a younger and more attractive woman, and that Dunbar felt jilted. This much of Prater's cross-examination of Dunbar was conducted on a Friday afternoon, following which the trial was adjourned until the following Tuesday.

On Tuesday morning, Dunbar brought to court with her a letter that Prater had written her a month before trial. Prater's letter, which she had not previously disclosed to the Assistant United States Attorney ("AUSA"), stated, *inter alia,* "I Love you Vickie.... I can't help but to care and Love you.... Love is Bobby + Vickie 4 ever," and signing it "Love Always, Bobby." The AUSA did not immediately disclose the letter to Prater's attorney. Rather, he allowed Prater to continue and complete his cross-examination of Dunbar, and then the AUSA introduced the letter on redirect examination to rebut the defense suggestion that Dunbar had been jilted. Prater unsuccessfully objected to the use of his letter and moved for a mistrial on the ground that the government's failure to disclose the letter earlier violated Fed. R.Crim.P. 16(a)(1)(A). Prater pursues this contention on appeal. We agree that the government had an obligation to disclose the letter and that it violated that duty; but given the late stage at which the government learned of the letter, we cannot conclude that its failure was so prejudicial as to require a new trial.

Under Rule 16(a), the government has an obligation to disclose, on re-

quest, "any relevant written or recorded statements made by the defendant ... within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government." Fed.R.Crim.P. 16(a)(1)(A). Statements covered by Rule 16(a)(1)(A) include written correspondence to third persons that come into the possession of the government. *See United States v. Caldwell,* 543 F.2d 1333, 1352–53 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Bailleaux,* 685 F.2d 1105, 1113 (9th Cir.1982) (custody requirement satisfied when tape was in possession of FBI). The Rule imposes no disclosure obligation, however, when the evidence is in the hands of a person who is not a government agent and the government has no reason to suspect that the evidence exists. *See, e.g., Thor v. United States,* 574 F.2d 215, 220–21 (5th Cir.1978) (federal government did not violate 16(a) when evidence was in the control of local police).

The duty of disclosure created by Rule 16(a) continues throughout the trial, so that "[i]f, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material." Fed.R.Crim.P. 16(c); *see also United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir.1993). The "duty of 'prompt notification' " is satisfied if the prosecutor tells the defendant about the statement as soon as the prosecutor becomes aware of it. *United States v. Ferrer–Cruz,* 899 F.2d 135, 140 (1st Cir.1990). If the government has failed to meet its obligations under Rule 16(a)(1)(A), a new trial will be required only if the defendant can show "that the failure to disclose caused him substantial prejudice." *United States v. Stevens,* 985 F.2d at 1181.

There is no question that Prater's letter to Dunbar was covered by Rule 16(a)(1)(A) and should have been disclosed to Prater when the AUSA first became aware of it. Though the AUSA apparently had no reason to know of the letter until Dunbar disclosed it, and Dunbar's prior knowledge of the letter cannot be imputed to the government, once the AUSA became aware of it prior to the resumption of trial on Tuesday morning, he had a duty to disclose it to Prater at that time. The withholding of the letter until Prater had completed the cross-examination of Dunbar violated the Rule.

Prater has not, however, shown that the brief delay caused him substantial prejudice. His defense emphasized the "jilted lover" theory during the early part of the cross-examination of Dunbar, prior to the AUSA's awareness of the existence of Prater's "Love, Always" letter to her. While Prater did not conclude the cross-examination until Tuesday, the defense had irretrievably committed itself to that theory prior to the government's knowledge of the letter.

We conclude that, in the circumstances, the district court did not abuse its discretion in refusing to grant Prater a mistrial.

### 3. *The Rule 404(b) Contention*

Dunbar testified on direct examination that she had disclosed Prater's bank-robbery statement to the police as a result of an argument among herself, the father of her children, and Prater on Christmas Day 1991. On cross-examination, Prater attacked Dunbar's character and, as discussed above, sought to show that Dunbar's testimony was the concoction of an unsavory woman piqued by Prater's abandonment of her for another woman. As the trial court stated to Prater's attorney during one conference:

> You have attacked this witness rather strenuously. You have attacked her on the grounds, amongst others, she's a woman who was in love with your client; that he would have nothing to do with her because she wouldn't give up her prostitution. You asked her that. She wouldn't give up her drug habit; you asked her that. She wouldn't give up her alcoholism; you asked her that, and because she didn't treat her children in the manner in which your client thought they ought to be treated.

(Tr. 746–47.)

On redirect examination, the government asked Dunbar what had happened on Christ-

mas Day to cause her to call the police. Over the objection of Prater's attorney stating, "we are getting into things that may be characterized as 404(B) material," Dunbar was allowed to testify that during the Christmas Day argument, Prater had threatened Dunbar and the father of her children with an ice pick. Prater contends that this testimony was inadmissible under Fed.R.Evid. 404(b) because it was introduced in order to show Prater's propensity for violence and because Prater was not given advance notice that the government would introduce such testimony. We disagree.

Rule 404(b) of the Federal Rules of Evidence provides as follows:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Notwithstanding the language of the provision for notice, which applies whether the government wishes to use the other-act evidence in its direct case, on rebuttal, or as impeachment, see Fed.R.Evid. 404(b) Advisory Committee Note, the notice requirement was "not intend[ed to] ... require the prosecution to disclose directly or indirectly the names and addresses of its witnesses," *id.* We are unpersuaded that either the substantive reach or the notice provision of the Rule was violated.

First, it does not appear that the ice-pick testimony was offered or admitted to show that Prater committed any other act "in conformity [ ]with" this threat of violence. Given the "rather strenuous[ ]" attack on Dunbar's character during Prater's cross-examination, which sought to show that Dunbar had created a fiction in a fit of jealous anger,

the government sought to provide a more objective reason for Dunbar's decision to pass on to the police Prater's statement that he had committed bank robbery. Plainly Rule 404(b) permitted the use of testimony that Prater attempted to stab Dunbar and the father of her children to show Dunbar's motive for turning Prater in to the police.

■ We note that it would have been appropriate for the trial court to give the jury a cautionary instruction that the ice-pick evidence was admitted only for this limited purpose. However, given the degree to which Prater's cross-examination of Dunbar had attacked her motives, we think it highly improbable that the jury would have used the evidence for any other purpose. In any event, Prater did not request such an instruction and cannot now complain that none was delivered.

■ Second, we are unpersuaded that the Rule required the government to give notice in advance of trial that Dunbar would testify about the ice-pick attack. Dunbar was designated as a confidential informant and the court denied Prater's pretrial motion for disclosure of her identity. Since the notice provision of Rule 404(b) was not intended to require the government to disclose the identity of its witnesses, either directly or indirectly, and it is difficult to believe that even general notice of an ice-pick attack would not have indicated that the informant was Dunbar, we conclude that the government did not violate the notice requirement by not notifying Prater that it might use evidence that he had attacked someone with an ice pick.

### 4. *The Prosecutor's Summation*

■ Prater also contends that comments by the AUSA during summation denied him a fair trial. He focuses principally on the following reference to a polygraph test:

> Special Agent Arena asked if he [Prater] would take a polygraph exam. He said he would. He testified that he told him they had a polygrapher right outside, that Mr. Prater said he wanted to talk to an attorney and that was the end of that.

(Tr. 1025.) Prater contends that this statement constituted an improper comment on

his invocation of his right to consult with counsel or to remain silent and that it asked the jury to infer his guilt from his exercise of those rights. Given the circumstances described below, we are not persuaded that the comment was improper, and we conclude that if there was any error it was harmless.

■ It is generally impermissible for the prosecution to comment on the accused's invocation of his right to remain silent in an effort to impeach the accused's exculpatory testimony at trial. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). However, when "the fact of earlier silence would *not* be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest," prosecutorial comment is permissible. *Id.* at 619–20 n. 11, 96 S.Ct. at 2246 n. 11. "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Id.; see also Leecan v. Lopes,* 893 F.2d 1434, 1442 (2d Cir.) ("brief inquiries on cross-examination concerning postarrest silence were warranted by [defendant's] testimony, which would otherwise have left the clear implication that he had proffered his alibi to the police upon surrender"), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990). Thus, while comment on a defendant's silence is usually improper, such comment may be permissible when the defendant, by the impression he has sought to create, has opened the door.

The door was opened in this case. Prater argued that he had spoken freely with police officers after his arrest and had voluntarily allowed them to search his car, and he attempted to give the jury the impression that he had been completely open with the authorities during their investigation of him. Had his attempt been limited to these arguments, we would agree that the government would have had no permissible basis for mentioning the fact that Prater did not take a lie detector test. However, Prater went beyond these arguments, as his attorney Richard Mott called as a witness Federal Bureau of Investigation Special Agent Andrew G. Arena and questioned him as follows:

Q. And do you recall ... asking Mr. Prater whether he would submit to a lie detector test?

A. Yes, I do.

Q. And, isn't it a fact, that Mr. Prater agreed to take a lie detector test at that time?

A. Initially he did.

MR. MOTT: Thank you very much. No further questions.

(Tr. 954.) The government, as it was entitled, promptly cross-examined in an attempt to dispel the impression left by this examination:

Q. Did there come a time when you had further discussion with Mr. Prater concerning a lie detector test?

A. Yes, I did.

. . . .

Q. What was his—what did he say at that time?

A. Well, initially he said he would take a lie detector test. We were at the Syracuse Police Department. I then told him we have a polygraphist outside, a Syracuse police officer, that could do it right now and he said I would like to talk to an attorney and I ceased the interview.

(*Id.* 954–55.)

We do not view either this questioning by the government or the mention of the testimony in its summation as urging the jury to infer Prater's guilt from his refusal to take a lie detector test or his invocation of his right to counsel. Rather, they appear to have been offered simply as a specific rebuttal to Prater's attempt to create the impression that he had been unqualifiedly willing to take a lie detector test.

■ In any event, if the AUSA's comment was improper, the impropriety was harmless. The trial court instructed the jury that "Mr. Prater has a constitutional right to make that request [for an attorney] at any time and you may draw no negative inference from his assertion of that right." (Tr. 1109.) Given the background and brevity of the comment and the delivery of the curative

instruction, we conclude beyond a reasonable doubt that any impropriety in the comment did not cause Prater any substantial prejudice.

## C. *The Sentencing Claim*

The United States Probation department prepared a presentence report ("PSR") with respect to each defendant. For each, the PSRs recommended a four-step increase in offense level for use of a dangerous weapon. The PSR for Prater, for example, stated as follows:

> Guideline 2B3.1(b)(2) provides for a four level increase if a dangerous weapon was used. A dangerous weapon includes any object that appeared to be a dangerous weapon that was brandished, displayed or possessed. During the course of the offense, the defendants possessed what appeared to be handguns. A four level increase is warranted.

Matthews and Prater objected, contending that, since they brandished but did not discharge or otherwise use their weapons, at most a three-level increase was warranted. The district court stated that "the jury could easily have found that each of the defendants in this case possessed what appeared to be handguns" (Matthews Sentencing Transcript, March 1, 1993, at 11), and "it seems to me that the four-level enhancement in this case is something that the guidelines do provide for" (Prater Sentencing Transcript, March 1, 1993, at 10), and it accepted the recommendation of the PSRs. On appeal, Matthews and Prater pursue their contentions that a three-level increase, rather than the four-level increase, was prescribed. For the reasons below, we agree.

With respect to a defendant convicted of robbery, the Guidelines instruct the sentencing court, in pertinent part, to adjust the base offense level as follows:

> (A) If a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, displayed, or possessed, in-

crease by 3 levels; or (F) if an express threat of death was made, increase by 2 levels.

Guidelines § 2B3.1(b)(2). Application Note 1 to this section refers to Guidelines § 1B1.1 for definitions of "dangerous weapon," "brandished," and "otherwise used." According to the definitions set forth in the latter section, the term "dangerous weapon" includes "an object that appeared to be a dangerous weapon [that] was brandished, displayed, or possessed," Guidelines § 1B1.1 Application Note 1(d); the term "brandished" means "that the weapon was pointed or waved about, or displayed in a threatening manner," *id.* Application Note 1(c) ("Note 1(c)"); and the term "otherwise used" means that "the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing," *id.* Application Note 1(g) ("Note 1(g)").

■ While we are required to give "due deference to the district court's application of the guidelines to the facts," 18 U.S.C. § 3742(e) (1988), where that application " 'approaches a purely legal question' " our standard of review is *de novo. United States v. James,* 998 F.2d 74, 82 (2d Cir.) (quoting *United States v. Vazzano,* 906 F.2d 879, 883 (2d Cir.1990)), *cert. denied,* — U.S. —, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). This Court has subjected the matter of whether a defendant's use of a weapon constituted "brandishing" as defined in Note 1(c), or "other use" as defined in Note 1(g), to *de novo* review. *See United States v. James,* 998 F.2d at 82–83.

In *James,* we noted that a robber's striking a victim with a gun was an example of how a firearm not discharged could be "otherwise used," as defined in Note 1(g). But we held that the robber's simply pointing the gun at another person to interrupt the latter's following him constituted only "brandish[ing]" within the meaning of Note 1(c), not "other[ ] use[ ]" within the meaning of Note 1(g).

■ In the present case, since the only "weapon" recovered by the police was the toy gun discarded in the weeds near the

supermarket, the court properly treated Matthews and Prater as having carried "dangerous weapons," *i.e.,* objects that appeared to be dangerous weapons, rather than actual firearms. As to the use of these weapons, the evidence was that the robbers ordered employees and customers of the bank to lie on the floor, pointed their weapons at these victims, and threatened to kill anyone who disobeyed. For example, Donnelly testified that the robbers told everyone, " 'If you don't keep your head down, you are going to get shot' " (Tr. 418); another customer testified that one of the robbers put his hand on the witness's shoulder and said, " 'Get down or I will blow your head off' " (Tr. 340); and a teller testified that one of the robbers kept saying, "Move and you are dead" (Tr. 323). Surveillance photographs showed robbers pointing their weapons at the victims.

Though the government argues that this combination of brandishing a weapon and uttering threats warrants the four-level increase provided by § 2B3.1(b)(2), we disagree. When a robber points a gun, or what appears to be a gun, at a robbery victim or bystander, that gesture is inherently threatening. And we should not have to point out, for it is tautological, that there can be no "display[ ] [of the gun] in a threatening manner," Note 1(c), without an implicit threat. Coupling that implicit threat with the utterance of an explicit verbal threat may constitute additional conduct, but it does not, in our view, constitute additional use of the weapon. Since the robbers here were not shown to have done anything more with their weapons than to brandish and point them menacingly, we conclude that the three-level enhancement provided for brandishing in § 2B3.1(b)(2)(E), rather than the four-level enhancement provided in § 2B3.1(b)(2)(D) for other use, should have been applied to Matthews and Prater.

We note that some of our sister Circuits have held that a defendant's pointing of a gun while making an explicit threat sufficed to warrant the four-level enhancement. *See, e.g., United States v. Seavoy,* 995 F.2d 1414, 1422 (7th Cir.) (defendant's "pointing of a firearm, combined with an explicit threat" was enough to justify four-level enhance-

ment), *cert. denied,* —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); *United States v. De La Rosa,* 911 F.2d 985, 993 (5th Cir.1990) (defendant's "addition of a threat to [accomplices] involved in the [kidnaping] scheme with her operates to bring this conduct within the orbit of 'otherwise used' "), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991). To a degree this may be because these courts have reviewed the enhancement under the more deferential clearly-erroneous standard of review. *See United States v. Seavoy,* 995 F.2d at 1422; *United States v. De La Rosa,* 911 F.2d at 993; *see also United States v. Hamilton,* 929 F.2d 1126, 1130 (6th Cir.1991) (four-level adjustment not clearly erroneous when defendant intentionally held knife to victim's throat and inadvertently injured her with it); *United States v. Roberts,* 898 F.2d 1465, 1468–70 (10th Cir.1990) (under *de novo* standard of review, holding knife next to victim's face, apparently without verbal threat, constituted "other[ ] use[ ]" rather than "brandish[ing]"). And to a degree the results may have been dictated by differences in the facts that might have led this Court, even under the *de novo* standard of review, to decide the same way. In *United States v. Seavoy,* for example, bank robbers sought a key to the vault and, apparently being told there was no key, one robber said, "Put a bullet in one of them and then they will remember." 995 F.2d at 1416. It could well be concluded that the expressed threat to shoot one person in order to extort action from another goes beyond what Note 1(c) intended to encompass in "brandish[ing]."

In any event, under the standard of review adopted in our prior cases, we conclude that in the circumstances of the present case, the pointing of the weapon in a threatening manner, even when coupled with a verbal threat, constitutes "brandish[ing]," rather than "other[ ] use[ ]" of the weapon. Accordingly, the offense levels of Matthews and Prater should have been increased under § 2B3.1(b)(2) by only three steps, not four.

## CONCLUSION

We have considered all of defendants' contentions on these appeals and, except to the

extent indicated above, have found them to be without merit. The convictions of Matthews and Prater are affirmed. Their sentences are vacated, and the matter is remanded to the district court for resentencing in a manner not inconsistent with this opinion.