USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________No. 99-1059 UNITED STATES, Appellee, v. DAVID HOLIS LAFORTUNE, A/K/A LUCKIE, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Hill, Senior Circuit Judge, and Boudin, Circuit Judge. _____________________ Joseph S. Berman, by appointment of the Court, with whomBerman & Dowell was on brief, for appellant. Margaret D. McGaughey, Assistant United States Attorney, withwhom Jay P. McCloskey, United States Attorney, was on brief, forappellee. ____________________ September 15, 1999 ____________________ HILL, Senior Circuit Judge. Appellant David Hollis"Luckie" LaFortune is an admitted bank robber. In calculatingLaFortune's sentence, the district court added a six-level weaponsenhancement, finding that LaFortune had "otherwise used," U.S.S.G.§ 2B3.1(b)(2)(B), rather than "brandished, displayed, orpossessed," U.S.S.G. § 2B3.1(b)(2)(C), a firearm during the robberywhich would have warranted only a five-level enhancement. Weaffirm. I. On February 4, 1998, LaFortune and co-defendant MichaelKenneth Morganstern stole a teal-colored minivan parked outside aconvenience store. The next morning, LaFortune and Morgansterndrove to the residence of a woman and her eleven-year-old son. They asked the woman to stitch closed the mouth openings of twoblack ski masks. Obtaining needle and thread from a neighbor, thewoman complied. Morganstern then told the boy that "he was goingto do something really stupid, [so] if he got shot, don't cry; hewas going to rob a bank, [but] don't tell [anybody]." The two menthen left the woman's house. That same morning, February 5, two young white malesentered a branch of the Bangor Savings Bank wearing black skimasks, ski-type gloves and dark parkas. According to a teller, onerobber announced the robbery, carried a silver-colored revolverwith a thin barrel, and stayed on the customer side of the counter. The other robber climbed or jumped over the teller counter, andbegan removing money from the cash drawers, filling a brown dufflebag with bank currency stacks. Pointing the silver gun at tellers and customers, thearmed robber then shoved or pushed one customer to the floor,telling her to "get down" and "don't talk." The customer saw thesilver flash of (what she perceived as) a gun in his hand. A bankemployee heard the armed robber yell for everyone to get down and"saw him wave the small handgun at people in the bank." Anotherbank employee reported that the armed robber pointed the handgundirectly at her and told her to get down. After the armed robberyelled at the robber behind the teller counter to hurry up, the tworan from the bank, removing their ski masks as they fled. Runningdown the street to the teal-colored minivan, they sped away, butnot before a citizen recorded its Maine license plate number. LaFortune and Morganstern returned to the woman's houselater that same morning, February 5. This time they were carryinga plain brown duffle bag. The bag contained money, ski-typegloves, the ski masks and the mini-revolver. The two men asked thewoman's child to dispose of the ski masks and gloves, and alsotheir sneakers, pants and shirts. The child obeyed by placing theitems in a dumpster outside. They also asked the boy to get rid ofthe keys to the teal-colored minivan. He threw them into a nearbyyard. At their direction, the child also bought the men two pairof new sneakers at the Bangor Mall. As the boy watched, Morganstern spread the cash out on asibling's bed in denominated piles and split the proceeds equally. The boy learned that LaFortune was the armed robber that had "heldthe gun, cocked, at the head of a female at the bank." It wasMorganstern who had jumped over the teller counter and gatheredcash. The two men left the woman's house, taking the revolverand duffle bag with them. Within the next five days, LaFortune andMorganstern would both be arrested and a two-count indictmentreturned against them by a federal grand jury. II. LaFortune pleaded guilty to bank robbery by force inviolation of 18 U.S.C. §§ 2113(a) and (d), and conspiracy to commitarmed bank robbery in violation of 18 U.S.C. § 371. On the record,at sentencing, the parties stipulated as to the factual statementset forth in the PSR. At the sentencing hearing, the district court heardtestimony from the bank's human resources director as to the traumainflicted upon bank employees, customers and their families byLaFortune's conduct. According to the bank representative,LaFortune's use of the silver revolver "gave the victims no reasonto expect that they would emerge from this robbery without becominganother statistic on the nightly news." The PSR recommended a six-level weapons enhancement ofLaFortune's sentence, U.S.S.G. § 2B3.1(b)(2), warranted as he had"otherwise used" a firearm during the bank robbery, rather than afive-level weapons enhancement, U.S.S.G. § 2B3.1(b)(3), for"brandishing" it. The district court agreed with therecommendation, finding itself particularly struck by the statementof the one victim that "all she remembered of the robbery wasstaring down the barrel of a gun and wondering when she would beshot." Based upon a total offense level of twenty-eight, and aCriminal History Category I, with a Sentencing Guideline range of78 to 97 months' imprisonment, the district court sentencedLaFortune to the maximum 97 months. He now appeals. III. A. LaFortune's appeal presents an issue of first impressionto this circuit. Here we must draw the line as to whether a weaponwas "otherwise used" or "brandished, displayed, or possessed"during a robbery in the context of the Sentencing Guidelines. Wereview de novo the interpretation by the district court of thelanguage and meaning of words used in the Sentencing Guidelines. See United States v. Núñez-Rodríguez, 92 F.3d 14, 19 (1st Cir.1996). Its findings of fact are reviewable for clear error. Id. B. The crime of robbery garners a base offense of 20 underU.S.S.G. § 2B3.1(a). Subsection (b)(2) of U.S.S.G. § 2B3.1outlines varying enhancements to the base offense of 20 dependingon the type of weapon used in the robbery and the degree of itsinvolvement: (A) if a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, displayed, or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.U.S.S.G. §§ 2B3.1(b)(2)(A)-(F). The terms "otherwise used" and "brandished" are definedin the Commentary to U.S.S.G. § 1B1.1. See U.S.S.G. § 2B3.1,comment. (n.1). The application notes provide that"'[b]randished' with reference to a dangerous weapon (including afirearm) means that the weapon was pointed or waved about, ordisplayed in a threatening manner." U.S.S.G. § 1B1.1, comment.(n.1(c)). They further explain that "'[o]therwise used' withreference to a dangerous weapon (including a firearm) means thatthe conduct did not amount to the discharge of a firearm but wasmore than brandishing, displaying, or possessing a firearm or otherdangerous weapon." U.S.S.G. § 1B1.1, comment. (n.1(g)). C. While the circuits are split on this issue, they are notevenly divided. Our decision falls in line with the weight of themajority. In United States v. Wooden, 169 F.3d 674 (11th Cir.1999), the Eleventh Circuit held that, during the course of arobbery at a Miami automatic teller machine, when the defendantpointed a .9 millimeter semi-automatic handgun approximately one-half inch from the victim's forehead, this constituted "otherwiseused" and not "brandishing." The Eleventh Circuit held thatalthough the case did not involve an explicit threat, Wooden'sconduct was equally coercive and threatening. Id. at 676. In United States v. Gilkey, 118 F.3d 702 (10th Cir.1997), the defendant robbed a diner at gunpoint. The Tenth Circuitheld that, although the district court's findings did notspecifically reveal whether there was any physical contact betweenthe gun and the victims, or that the defendant explicitlyverbalized a threat to kill, his use of the gun to directlythreaten the victims and to force them to move according to hisdirections was more culpable than brandishing. Id. at 705. Theyfound that it was the specific rather than the general pointing ofthe gun that elevated its use from mere "brandishment" to"otherwise used." Id. at 706; see also United States v. Roberts,898 F.2d 1465 (10th Cir. 1990) (where "otherwise used" obtainedwhen the defendant walked up behind the victim, put his arm aroundher, held a knife next to her face and neck, and demanded money);United States v. Elkins, 16 F.3d 952 (8th Cir. 1994) (where"otherwise used" obtained when defendant, after receiving moneyfrom a bank teller, forced a bank customer at knife-point out ofthe bank and into the parking lot where he demanded keys to thecustomer's car). By contrast, the Second Circuit in United States v.Matthews, 20 F.3d 538 (2d Cir. 1994), held that bank robbers whoordered employees and customers to lie on the floor, pointed theirweapons at these victims, and threatened to kill anyone whodisobeyed ("Get down or I will blow your head off."; "Move and youare dead."; "If you don't keep your head down, you are going to getshot."), id. at 554, were merely brandishing their firearms. Wedecline to follow this rationale. D. In this case, LaFortune contends that his waving andpointing of the silver revolver at bank tellers and customers,together with his instruction that persons in the bank "get down,"without an explicit threat to any person, constitute brandishing,and that therefore the district court holding must be reversed. Matthews, 20 F.3d at 553; United States v. González, 40 F.3d 735,740 (5th Cir. 1994), cert. denied, 115 S. Ct. 1716 (1995). Heclaims that to hold otherwise would render the definition ofbrandishing superfluous. See U.S.S.G. § 1B1.1, comment. (n.1(c)),supra. The government contends, and the district court held,that when LaFortune pointed a cocked gun at the head of femaleteller, held the gun in his hand while shoving a customer to thefloor, ordering (by yelling at) her to get down, don't talk, andaimed the weapon directly at another bank employee while givingorders, it constituted "otherwise used." Wooden, 169 F.3d at 676;Gilkey, 118 F.3d at 705. We agree. LaFortune's conduct amounted to more thanbrandishing, the general pointing or waving the weapon about in athreatening manner. As we view it, a person may "brandish" aweapon to "advise" those concerned that he possesses the generalability to do violence, and that violence is imminently andimmediately available. A general, or even pompous, showing ofweapons, involving what one would consider an arrogantdemonstration of their presence, constitutes the generalizedwarning that these weapons may be, in the future, used and notmerely brandished. Altering this general display of weaponry byspecifically leveling a cocked firearm at the head or body of abank teller or customer, ordering them to move or be quietaccording to one's direction, is a cessation of "brandishing" andthe commencement of "otherwise used." Gilkey, 118 F.3d at 706. IV. The judgment of the district court is AFFIRMED.