UNITED STATES of America,
Appellee,

v.

Willie L. YELVERTON, Appellant.

No. 99–3032.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 21, 1999.

Decided Dec. 10, 1999.

Edward C. Sussman, appointed by the court, argued the cause and filed the briefs for appellant.

Barbara A. Grewe, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher, Mary-Patrice Brown, DeMaurice F. Smith and G. Bradley Weinsheimer, Assistant U.S. Attorneys.

Before: SILBERMAN, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Appellant Willie L. Yelverton appeals his conviction by a jury of kidnaping and related charges on four principal grounds.[1]

---

1. Yelverton was convicted of conspiracy to kidnap, in violation of 18 U.S.C. § 371, kidnaping, 18 U.S.C. § 1201(a) and § 2, interference with commerce by threats and violence, 18 U.S.C. § 1951 and § 2, and interstate transmission of extortionate threats, 18 U.S.C. § 2.

Only two require more than brief discussion. Specifically, Yelverton contends that the district court erred by (1) enhancing his sentence under United States Sentencing Guidelines § 2A4.1(b)(3) for "use" of a gun where he did no more than display or brandish the gun during the course of the kidnaping, and (2) denying his motion to dismiss the indictment for violation of his Sixth Amendment right to speedy sentencing. We hold that § 2A4.1(b)(3) is properly applied where the gun is employed in a manner designed to coerce a third party so as to complete the kidnaping offense, that is, where a photograph of a person pointing a gun at the head of a kidnaping victim is shown to the victim's parent in tandem with a telephonic threat of further injury to the victim in order to coerce the parent into paying a ransom. Assuming that the Sixth Amendment right to a speedy trial extends to sentencing, *see Pollard v. United States,* 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), we hold that Yelverton fails to meet his burden under *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Although his sentencing was unnecessarily delayed for thirty-three months despite his repeated requests for prompt sentencing, he has demonstrated neither prosecutorial misconduct nor prejudice, key factors in the determination of whether a defendant has been deprived of his Sixth Amendment right. Concluding further that Yelverton's other challenges to his conviction are meritless, we affirm.

## I.

■ Under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the punishment for kidnaping, abduction, and unlawful restraint is to be increased by two levels "[i]f a dangerous weapon was used." U.S.S.G. § 2A4.1(b)(3) (1995). The Application Notes state that the phrase " '[a] dangerous weapon was used' means that a firearm was discharged, or a 'firearm' or 'dangerous weapon' was 'otherwise used.' " U.S.S.G.

§ 2A4.1 comment, n.2. The U.S.S.G. commentary defines the term "otherwise used" to mean "that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1 comment, n.1(g). Additionally, "brandished" is defined to mean that the weapon was "pointed or waved about, or displayed in a threatening manner." U.S.S.G. § 1B1.1 comment, n.1(c).

The district court enhanced Yelverton's sentence based on evidence that he and his co-defendants informed the kidnaping victim's mother and a detective posing as his father that their son was in custody and would be tortured and killed unless they paid a ransom. During a subsequent telephone call, the mother and the detective were directed to a photograph that showed the son blindfolded and another person's arm holding a gun to his head.

■ Yelverton contends that the pointing of a gun at the son's head in a photograph seen by his mother, combined with threats to the son's safety directed at his mother in an effort to extract ransom money from her, cannot constitute "use" of a firearm under the Sentencing Guidelines. Specifically, Yelverton contends that the case law establishes that a firearm is "otherwise used" only where the firearm is pointed at a specific victim, and is accompanied by a specific command to the same victim to facilitate the underlying crime. Because the basis for enhancement here was the use of a gun pointed at the son in order to coerce his mother to pay a ransom, Yelverton contends that the district court erred; the gun was merely "brandished" or "displayed." Our review of the district court's application of a Sentencing Guideline is for clear error as to factual findings and with due deference to the district court's application of the guideline to a factual setting. *See United States v. Becraft,* 117 F.3d 1450, 1451 (D.C.Cir. 1997); *United States v. Kim,* 23 F.3d 513, 516–17 (D.C.Cir.1994).

Virtually all of the circuits to address the question have held that where a dangerous weapon is pointed at a person and some further verbal threat or order accompanies the pointing of the weapon to facilitate commission of the underlying crime, an enhancement for the use of the weapon is justified. *See, e.g., United States v. Wooden,* 169 F.3d 674, 676–77 (11th Cir. 1999); *United States v. Gilkey,* 118 F.3d 702, 705 (10th Cir.1997); *United States v. Hernandez,* 106 F.3d 737, 741 (7th Cir. 1997); *United States v. Fuller,* 99 F.3d 926, 927 (9th Cir.1996); *United States v. Elkins,* 16 F.3d 952, 953–54 (8th Cir.1994); *United States v. Johnson,* 931 F.2d 238, 240–41 (3d Cir.1991); *United States v. De La Rosa,* 911 F.2d 985, 992 (5th Cir.1990).[2] The underlying rationale of the majority view suggests that the key consideration is whether a gun (or other weapon) was pointed at a specific person in an effort to create fear so as to facilitate compliance with a demand, and ultimately to facilitate the commission of the crime. *See, e.g., Hernandez,* 106 F.3d at 741; *Fuller,* 99 F.3d at 927; *Gordon,* 19 F.3d at 1388. This is distinct from a rationale based on the fact that the gun was pointed at the same person in whom fear was sought to be instilled, or even that the person sought to be coerced was the victim of the crime, as opposed to a third party whose complicity the perpetrator sought to ensure. With regard to the latter, for example, courts have found "use" of a weapon where a knife was held to the throat of a third party (a bank patron) to facilitate commis-

sion of a bank robbery, *see Elkins,* 16 F.3d at 953–54, and where a gun was waved by a kidnaper during an argument with her accomplices, and she "warned that anyone going to the police would have to deal with her." *De La Rosa,* 911 F.2d at 993.

What distinguishes Yelverton's case from the other cases is the fact that the gun and the threats were directed at two different people in two different locations at two different times. While Yelverton conceded at oral argument that § 2A4.1(b)(3) would apply where the gun holder did something that increased the inherent threat to those in his presence, he asserts that extension of the enhancement to a person who is not at the same location as the weapon carries the enhancement farther than was intended. We find nothing to suggest that the temporal and spatial elements he identifies are necessary, in contrast to sufficient, in order for § 2A4.1(b)(3) to apply. While we have found no case directly on point, inasmuch as most of the cases involve the time and space elements that Yelverton posits, nothing in the language of the Guidelines or the case law suggests that a weapon can only be "otherwise used" in those circumstances. Instead, the rationale of the weight of authority focuses on the use of the gun or other dangerous weapon to instill fear to promote commission of the underlying crime. *See, e.g., Hernandez,* 106 F.3d at 741; *Fuller,* 99 F.3d at 927; *Gordon,* 19 F.3d at 1388. Splitting the "use" of the gun between two persons at different locations, so long as the pointing

---

2. Two decisions to the effect that a dangerous weapon is merely "brandished" rather than "used" when it is pointed directly at a person and is accompanied by an express demand or threat, are contrary to weight of authority and distinguishable on their facts. *See Wooden,* 169 F.3d at 677 n. 5 (citing *United States v. Gonzales,* 40 F.3d 735, 740 (5th Cir.1994), and *United States v. Matthews,* 20 F.3d 538 (2d Cir.1994)). In *Gonzales,* the Fifth Circuit vacated and remanded for re-sentencing, holding that the district court erred in ruling that pointing a gun at a cashier, coupled with a demand for money, was "use" of a gun. Unlike the instant case, there were no explicit

threats communicated that anyone would be tortured and killed absent cooperation by others in facilitating the robbery. And while the Second Circuit in *United States v. Matthews,* 20 F.3d 538, 554 (2d Cir.1994), vacated and remanded for re-sentencing because the district court erred in ruling that pointing a gun combined with an explicit threat constituted "use," the court noted that "[i]t could well be concluded that the expressed threat to shoot one person in order to extort action from another goes beyond what [the sentencing guidelines are] intended to encompass in 'brandish[ing].'" *Id.* The instant case is such a case.

of the gun at one person is used to instill fear in the other person so as to coerce compliance, and hence facilitate commission of the underlying crime, does not diminish the culpable "use" at issue in the Guidelines.

■ Yelverton and his accomplices sought to coerce the mother's payment of a ransom by putting her in fear for her kidnaped son's life. That the mother learned of the gun at a different time and in a different place than when and where the gun actually was held to her son's head is irrelevant; the photograph to which the mother was directed, combined with explicit threats to her son's life and safety, and the fact that the son remained in custody. at the time his mother's attention was directed to the photograph, make clear that the gun was used to suggest it would be used against her son if she did not pay the ransom. Given the approach of the Guidelines toward the use of dangerous weapons as increasing the coerciveness or dangerousness of criminal activity, *cf., e.g., Hernandez*, 106 F.3d at 741, it is entirely fitting that "use" of a dangerous weapon include situations where a gun is pointed at a victim in involuntary custody in an effort to frighten a family member to pay a ransom, thereby completing the kidnaping scheme by seeking "ransom or reward." 18 U.S.C. § 1201(a). This is particularly so where the threat of potential torture or murder of the kidnaping victim should ransom not be paid is made explicit to the family member, as here by a telephone call to the mother that enhanced the significance of the dangerous situation portrayed in the photograph. Where, then, the deployment of the gun is accompanied by direct and explicit threats to a mother about her son's well–being in order to coerce her into paying a ransom, holding

§ 2A4.1(b)(3) inapplicable would serve no purpose other than to undercut the purpose of the enhancement provision. Therefore, we hold that the district court did not err in enhancing Yelverton's sentence under § 2A4.1(b)(3).[3]

## II.

■ Yelverton contends that the thirty-three month delay between the return of the jury's verdict and the imposition of his sentence violated his Sixth Amendment right to speedy sentencing. The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. amend. VI. Neither the Supreme Court nor this court has held that the Sixth Amendment right to a speedy trial reaches sentencing, but in *Pollard v. United States*, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), the Supreme Court assumed that it did. In *Pollard*, the Court explained that "the delay must not be purposeful or oppressive," observing that "[t]he time for sentence is of course not at the will of the judge [because] Rule 32(a) of the Federal Rules of Criminal Procedure requires the imposition of a sentence 'without unreasonable delay.'"[4]

---

**3.** Yelverton's contention that enhancement for "use" of a firearm is inappropriate because he was acquitted of firearms charges under 18 U.S.C. § 924(c), is meritless. A sentencing court may consider conduct for which a defendant was acquitted, "so long as that conduct has been proved by a preponderance of the evidence." *United States v. Thomas*, 114

F.3d 228, 261 (D.C.Cir.1997); *see also United States v. Dozier*, 162 F.3d 120, 125 (D.C.Cir. 1998).

**4.** Rule 32(a) was amended in 1994 to read:

> **In General; Time for Sentencing.** When a presentence investigation and report are

*Id.* Subsequently, in establishing the test for determining whether a defendant has been deprived of his Sixth Amendment rights due to unreasonable pre-trial delay, the Court cited *Pollard,* as well as cases involving pre-trial delay. *Barker v. Wingo,* 407 U.S. 514, 531 n. 32, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). That test involved the balancing of four factors: the "[l]ength of delay, the reason for delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* Yelverton maintains that the district court abused its discretion by failing to apply this four-factor balancing test and thus erred in denying his motion to dismiss the indictment.[5]

The record shows that Yelverton's sentencing hearing originally was to be held on August 19, 1996. The district court held a pre-sentence hearing on August 14, 1996, which resulted in a continuance until September 5, 1996, to allow Yelverton time to respond to the government's motion for an upward departure under U.S.S.C. § 4A1.3, which he did on August 20, 1996. At the September 5th hearing, the district court rejected the government's attempt to rely on an armed robbery conviction that was more than twenty-five years old to justify an upward departure, but stated that it wished to examine the record of the 1987 drug conspiracy conviction reversed on appeal to obtain information about Yelverton's underlying conduct; accordingly sentencing was continued until September 16, 1996, to permit review of the 1987 records. By that date, the 1987 records had not been located, and the district court again continued Yelverton's sentencing

hearing while imposing sentences on co-defendants Seals and Sweatt.[6]

On September 25, 1996, Yelverton filed a motion for immediate sentencing within the guideline range, which was 135 to 168 months imprisonment. No action appears to have been taken on this motion. On January 16, 1997, the government filed a supplemental memorandum citing *United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997), for the proposition that acquitted conduct may be considered in sentencing, and pointed to the statement of facts in its 1987 appellate brief; no transcripts relating to the 1987 conviction were produced. The government requested that the district court set a sentencing date and rule on the motion for an upward departure. Yelverton filed a response on February 10, 1997, purportedly arguing that the government's materials did not shed light on the evidence in the 1987 case and that the government thus failed to meet its burden of demonstrating that he had engaged in conduct that supported an upward departure; he requested again that he be sentenced within the Guideline range.

By letter of June 25, 1997, Yelverton's counsel alerted the district court that Yelverton still had not been sentenced and that no sentencing date had been set. On March 25, 1998, Yelverton filed a motion requesting that a sentencing date be set, purportedly noting that almost two years had elapsed since the date of his conviction, and repeating that the government had found no information about his prior criminal conduct that would support an upward departure and had apparently

made under subdivision (b)(1), sentence should be imposed without unnecessary delay following completion of the process prescribed by subdivision (b)(6). The time limits prescribed in subdivision (b)(6) may be either shortened or lengthened for good cause.

5. Those Circuit Courts of Appeals that have considered the question apply a *Barker v. Wingo* analysis in evaluating speedy sentencing claims. *See, e.g., United States v. Thomas,*

167 F.3d 299, 303 (6th Cir.1999); *United States v. Abou–Kassem,* 78 F.3d 161, 167 (5th Cir.1996); *United States v. Rothrock,* 20 F.3d 709, 711–12 (7th Cir.1994); *United States v. Martinez,* 837 F.2d 861, 866–67 (9th Cir. 1988); *Perez v. Sullivan,* 793 F.2d 249, 252–54 (10th Cir.1986); *United States v. Campisi,* 583 F.2d 692, 694 (3d Cir.1978).

6. Both co-defendants were sentenced to life imprisonment.

abandoned its effort. The government did not respond.

Finally, sentencing was set for February 19, 1999. Yelverton filed a motion to dismiss the indictment on the grounds that the district court had failed to impose sentence in a timely manner. At the hearing, the district court ruled that it lacked sufficient evidence to support an upward departure based on Yelverton's conduct underlying the 1987 conviction, denied Yelverton's motion to dismiss the indictment in the absence of evidence of prejudice from the delay of sentencing, and sentenced him to 150 months' imprisonment, in the middle of the Guideline range, in consideration of the delay.[7]

From this record, Yelverton draws the conclusion that the first three factors of the *Barker v. Wingo* test weigh heavily in favor of dismissal of the indictment and that he also presented evidence of the requisite prejudice. He notes, first, that the length of the delay—thirty-three months—was exceptional.[8] He maintains, second, that the reason for the delay demonstrates its unreasonableness: his sentencing was substantially delayed as a result of the government's efforts to obtain information to support an upward departure under U.S.S.G. § 4A1.3, although it was clear by at least February 1997 that the government had come up empty-handed because its extended searches had produced only its own brief. To the extent that the government sought to supplement its motion for enhancement of Yelverton's sentence with any information that the district court's own efforts might uncover, Yelverton's counsel had inspected that information and advised the district court by

memorandum filed February 10, 1997, that the records did not support the government's position. Still sentencing did not occur for two more years. As to the third *Barker v. Wingo* factor, Yelverton notes his repeated requests for sentencing. Finally, he maintains, he was prejudiced by the delay in exercising his right of appeal; by a lengthy and unnecessary period in the District of Columbia Jail, "a facility with well publicized shortcomings"; and by almost three years' anxiety as a result of the government's prolonged efforts to obtain a life sentence.

■ We agree that Yelverton's sentencing was unnecessarily delayed. Assuredly, both the prosecutor and the district court bear responsibility for ensuring that sentencing occurs within a reasonable time after conviction. *See Pollard*, 352 U.S. at 361, 77 S.Ct. at 486 (citing Fed.R.Crim.P. 32(a)). Yelverton points to the government's neglect in failing to respond to his motion to dismiss the indictment, and he faults the district court for failing to consider the *Barker* factors other than prejudice at the time of sentencing, much less for failing to respond to his requests for prompt sentencing. Once the government advised the district court that its repeated searches of the 1987 records were unproductive, the need for further delay appears to have evaporated and Yelverton should have been promptly sentenced. While it was in his interest to be sentenced without waiting for the government to uncover material to support an upward departure, his requests to be sentenced took on added significance as the delay in sentencing increased. According leeway to the district

---

7. In declining to impose an upward departure based on Yelverton's conduct underlying a 1987 narcotics conspiracy conviction that had been overturned on appeal, the district court determined that it "could not be satisfied that [it] had reviewed sufficient evidence to find as a factual matter ... that the defendant committed the offense [of murder, on which the jury apparently hung]," having access only to briefs and other materials but not a transcript of the trial proceedings or other evidence.

8. The court has noted in the context of pre-trial delay that "any delay of a year or more triggers our scrutiny." *United States v. Lindsey*, 47 F.3d 440, 443 (D.C.Cir.1995), *vacated on other grounds*, *Robinson v. United States*, 516 U.S. 1023, 116 S.Ct. 665, 133 L.Ed.2d 516 (1995); *see also Thomas*, 167 F.3d at 304.

court in light of demands on its schedule, thirty-three months is too long. The district court was apparently of the same view, sentencing Yelverton in the middle rather than at the high end of the Guideline sentencing range in view of the delay.

On the other hand, despite the excessive delay and repeated requests for sentencing, Yelverton fails to show any misconduct by the government; rather the record shows that the delay was inadvertent or accidental, not purposeful or due to malevolent conduct by the government. *See Pollard,* 352 U.S. at 361–62, 77 S.Ct. 481. Initially, the government could not locate the 1987 records; when it did, it proceeded to search for relevant material. Yelverton properly concedes that some delay to allow the government to search for information to support an upward departure is appropriate. His complaint arises once the government reported the futility of its efforts. That he did not seek mandamus from this court to compel the district court to impose sentence, suggests, perhaps, that he saw no misconduct afoot.

▮ Consequently, as the district court recognized, the key factor in evaluating his Sixth Amendment claim is prejudice, and here the delay of Yelverton's right of appeal is the most problematic.[9] The government ignores this claim of prejudice in its brief on appeal. Obviously, where a defendant proves to have a meritorious claim on appeal, the prejudice from a delayed appeal is clear. But a showing of prejudice cannot be entirely contingent upon success on appeal, for that would seriously undermine the right to a speedy sentencing, if such a right exists. Consequently, it is precisely because it will be difficult to determine at the time of sentencing whether an appeal will result in a reversal of the conviction or other relief for a defendant that the requirement of Rule 32(a) that sentence be imposed "without unnecessary delay" assumes added significance. Put otherwise, prejudice caused by a delayed "right of appeal" does not fit easily within the pretrial jurisprudence on the prejudice factor of the *Barker v. Wingo* test. Protection of the right of appeal, insofar as it is implicated by the right to speedy sentencing, rests heavily on the government and the district court. This we view to be implicit in the mandate of the federal rule. When these protections fail, the question of appropriate remedy, if any, remains.

Yelverton's complaint that a judicial apology for the delay and several months' reduction in sentence as a result of the delay is an inadequate remedy overlooks the jurisprudence under *Barker v. Wingo,* which takes into account the severity of the prejudice in evaluating a Sixth Amendment claim. *See, e.g., Lindsey,* 47 F.3d at 443. The fact that Yelverton's challenges

---

9. Yelverton's other evidence of prejudice is unavailing. First, mere generalized anxiety is insufficient to establish prejudice, even when such anxiety is due to a pre-trial delay in excess of four years. *Barker,* 407 U.S. at 534, 92 S.Ct. 2182. As this court has noted, such generalized anxiety in itself "is neither 'necessary [n]or sufficient ... to the finding of a deprivation of the right of speedy trial.'" *Lindsey,* 47 F.3d at 443 (quoting *Barker,* 407 U.S. at 533, 92 S.Ct. 2182). *Cf. Perez,* 793 F.2d at 257. Of course, a life sentence, which Yelverton knew the government sought, is significantly different from fourteen-years imprisonment under the Guidelines, and some generalized anxiety on his part as he awaited sentencing was understandable. However, absent evidence of severe anxiety, as, perhaps, documented by psychiatric records or expert testimony, we are left with what amounts to rank speculation about Yelverton's general state of mind, and this is insufficient to establish a Sixth Amendment violation. *See id.; see also Thomas,* 167 F.3d at 305; *Rothrock,* 20 F.3d at 712; *Martinez,* 837 F.2d at 867.

Likewise, little weight need be given to Yelverton's complaint about his extended stay at the D.C. Jail while he awaited sentencing in the absence of any evidence that he was a victim of untoward or unusual suffering as a result. To the contrary, it is well established that a prisoner does not have a right to be housed in a particular institution. *See, e.g., Sandin v. Conner,* 515 U.S. 472, 478–79, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Thomas,* 167 F.3d at 305; *Perez,* 793 F.2d at 257.

to the legitimacy of his conviction clearly lack merit, *see infra* n.11, combined with the fact that Yelverton was facing a minimum sentence—even if his sentencing enhancement argument under U.S.S.G. § 2A4.1(b)(3) had prevailed—far in excess of his delay in sentencing, suggest that any prejudice suffered by Yelverton with respect to the delay of his right to appeal did not merit a remedy greater than that provided by the district court. *Cf. Pollard,* 352 U.S. at 362, 77 S.Ct. 481. He makes no claim that the delay affected his ability to present his position on his sentence or adversely affected the sentence he received. There also is nothing in the record to suggest that he suffered the type of "purposeful or oppressive" delay that was of concern to the Supreme Court in *Pollard. Id.* at 361, 77 S.Ct. 481. Absent some indication that Yelverton's sentence would have been shorter or substantively different without the delay, his status as a convicted defendant weighs more heavily in evaluating the appropriate remedy. *See, e.g., Thomas,* 167 F.3d at 305; *Rothrock,* 20 F.3d at 712; *Martinez,* 837 F.2d at 867; *Perez,* 793 F.2d at 257. Of course, "inadvertent delay" or "accidental delay" of this magnitude, particularly in view of defense and government requests that sentencing proceed, might, notwithstanding the change in the defendant's status after conviction, take on added weight were there evidence of meaningful prejudice, as discussed in *Barker,* but Yelverton does not demonstrate such prejudice.

Accordingly, in view of the inadvertence of the delay after January 1997 and the absence of any evidence of prosecutorial misconduct or of serious prejudice, Yelverton's Sixth Amendment claim fails under the *Barker v. Wingo* test,[10] and because his other challenges to his conviction are meritless,[11] we affirm.

---

10. Because of the clarity of the record on which Yelverton relies, a remand, which Yelverton suggests as alternative relief to dismissal of the indictment, to allow the district judge to place on the record its findings about the *Barker* factors in addition to prejudice, *see United States v. Mills,* 925 F.2d 455, 464 (D.C.Cir.1991), would be meaningless. *See United States v. Davis,* 181 F.3d 147, 150 (D.C.Cir.1999).

11. Yelverton's contention that the district court erred in denying his motion to dismiss the indictment for violation of the Speedy Trial Act, 18 U.S.C. § 3161 et seq., where the government proceeded in the Superior Court of the District of Columbia until a federal indictment was brought more than thirty days later, is controlled by *United States v. Seals,* 130 F.3d 451, 454–55 (D.C.Cir.1997), *cert. denied,* 524 U.S. 928, 118 S.Ct. 2323, 141 L.Ed.2d 697 (1998), and —— U.S. ——, 119 S.Ct. 111, 142 L.Ed.2d 89 (1998), where the court rejected a similar claim by one of his co-defendants.

Nor do we find an abuse of discretion by the district court in denying Yelverton's motion for severance under Fed.R.Crim.P. 14, because his defense was not fundamentally inconsistent with that of his co-defendants and there was no risk that the jury would infer his guilt from a conflict. *See United States v. Tarantino,* 846 F.2d 1384, 1399 (D.C.Cir.1988); *see also United States v. Haldeman,* 559 F.2d 31, 71 (D.C.Cir.1976). Credibility problems arising from his co-defendants' evidence attempting to exculpate him is not the kind of conflict that a severance is designed to cure, *see id.,* especially where Yelverton did not present a defense, much less testify himself. Yelverton presents no authority to the contrary. *Cf. Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).