Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify
the Clerk of any formal errors in order that corrections may be made
before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2003       Decided December 30, 2003

No. 02-3023

UNITED STATES OF AMERICA,
APPELLEE

v.

ALONZO GIBSON,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 94cr00193–02)

*Jonathan L. Katz*, appointed by the court, argued the cause
and filed the briefs for appellant.

*Alonzo Gibson* was on the *pro se* brief for appellant.

*Elizabeth H. Danello*, Assistant U.S. Attorney, argued the
cause for appellee. With her on the brief were *Roscoe C.
Howard, Jr.*, U.S. Attorney, *John R. Fisher*, *Roy W.*

Bills of costs must be filed within 14 days after entry of judgment.
The court looks with disfavor upon motions to file bills of costs out
of time.

*McLeese, III*, and *Martin D. Carpenter*, Assistant U.S. Attorneys.

Before: SENTELLE, RANDOLPH and ROGERS, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Alonzo Gibson appeals his conviction of possession of cocaine with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii) (2003), and conspiracy to possess cocaine with intent to distribute, *see id.* § 846, on the ground that the imposition of his sentence over seven years after the jury returned a guilty verdict violated his right to speedy sentencing under the Sixth Amendment. Assuming that such a right exists, we hold that it was not violated. The delay was extraordinarily long, but Gibson, far from being prejudiced, actively contributed to it and never requested prompt sentencing. With the exception of a 35–month institutional delay due to the loss of Gibson's *pro se* motions in chambers, the remaining delay was caused by Gibson, who filed multiple motions and requests for continuances and repeatedly resisted sentencing by the district court. These circumstances defeat his attempt to shift course on appeal. Gibson's other sentencing challenge, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), is identical to a claim that was rejected in *United States v. Graham*, 317 F.3d 262, 273–74 (D.C. Cir. 2003). Because Gibson's remaining challenges to his conviction are without merit, we affirm the judgment of conviction.

## I.

The evidence, which we must view in the light most favorable to the government, *see United States v. Wilson*, 160 F.3d 732, 736–37 (D.C. Cir. 1998), shows that Gibson was involved in arranging for Federal Express to ship from Los Angeles two boxes containing cocaine, one to an apartment in Silver Spring, Maryland and one to an address in the District of Columbia. The government's evidence showed that three men, who claimed not to be together although they conversed together, entered a Federal Express office in Los Angeles on

April 14, 1994. Two of the men each carried a box, and the third man leaned on the counter. Gonzaver Braziel, a Federal Express employee who processed one of the packages, identified Gibson in a photo array as possibly being the third man and at trial identified Gibson as that man. After the three men left, Federal Express employees, whose suspicions were aroused by the behavior of the three men and certain details of the shipments, notified security personnel, who determined, upon x-raying the boxes, that they appeared to contain drugs. Federal Express employees opened one box and found a white powdery substance. The box was resealed, and both boxes were shipped to Federal Express headquarters in Memphis, Tennessee, and then to the District of Columbia, where Federal Express delivered the two boxes to United States Drug Enforcement Administration ("DEA") agents.

After searching the boxes pursuant to search warrants, DEA agents found that the powdery substance field-tested positive for cocaine: the box addressed to Maryland contained 2.994kg of 86% pure cocaine hydrochloride, and the box addressed to the District of Columbia contained 3.007kg of 90% pure cocaine. DEA agents, dressed as Federal Express employees, delivered the Maryland box, which indicated the sender was "Greg Smith" and the addressee was "Larry Davis," to the Maryland address, which turned out to be an apartment rented by Fatoumata Doumbia, Gibson's girlfriend. A few minutes after delivery, DEA agents executed a search warrant for the apartment. They found Gibson in a bedroom bending over the box that had just been delivered; with him were two pink sender's receipts, one for each of the boxes sent from Los Angeles. Also in the bedroom were two identification cards that bore Gibson's photograph, one showing the name "Greg Smith" and the other "Larry Davis." Gibson told agents that the box belonged to him and that he had been instructed to call an answering service upon delivery and say that "Snoop–Doggie–Dog" had called, and someone would call back and tell him where to deliver it. Gibson also told agents that the box contained marijuana. At trial, Doumbia testified about Gibson obtaining the fake identifica-

tion cards and confirmed that Gibson had gone to Los Angeles twice in April 1994, calling her on April 15, 1994, to pick him up at the airport. She also testified that she gave the box to Gibson because he had told her he was expecting it.

The second box listed the sender as "Denise Jones" and was addressed to "Twanna Jones" at an apartment in the District of Columbia. Vi–Ki Dennis Taylor, Gibson's co-defendant, met the agent outside of the apartment and offered to accept delivery for Twanna Jones, whom he claimed was his sister. The agent refused, left, and later returned and delivered the box to Twanna Jones, who said the package was for Taylor. Before DEA agents could execute a search warrant, Twanna Jones and Taylor drove off with the box in a car registered to Antoine Jones, Twanna's brother, who had told her to expect a package for Taylor to be sent to her. Taylor was later arrested at his own apartment in Maryland, and DEA agents found the empty box nearby. The DEA agents also found 992.4 grams of 88% pure cocaine hydrochloride in the trunk of the car Taylor had been driving, along with a notebook containing addresses for "Greg Smith" and "Larry Davis," the names on Gibson's false identifications, one of which was the Maryland address at which Gibson had been arrested. A search of Antoine Jones' apartment in Virginia later uncovered supermarket and insurance cards in Gibson's name, as well as a yellow sticker and a napkin each bearing the Maryland address where Gibson had been arrested.

Gibson and Taylor were indicted on two counts: possession of with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii), and conspiracy to possess with intent to distribute, *see id.* § 846, more than five kilograms of cocaine. Pursuant to then-prevailing precedent in this circuit, the jury was not instructed to determine the relevant drug quantity beyond a reasonable doubt, only whether Gibson possessed or conspired to possess "a detectable or measurable amount of cocaine." The jury returned its verdict on November 9, 1994, finding Gibson guilty of both counts. On February 8, 2002, the district court sentenced Gibson to concurrent terms of 240 months imprisonment, to be followed by concurrent three-

year terms of supervised release, and imposed a special assessment of $50 on each count.

## II.

Of the multiple challenges by Gibson to his conviction, only five require discussion. Part II discusses three trial-related claims, and Parts III and IV address the two challenges to his sentence.

First, it is clear that Gibson's contention that his conviction rested on insufficient evidence fails. The court reviews challenges to the sufficiency of the evidence *de novo*, *see United States v. Fennell*, 53 F.3d 1296, 1298 (D.C. Cir. 1995), in order to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). That standard is met here.

Gibson was arrested with the Maryland box in his possession,[1] and the jury heard testimony both that he had been expecting the box and that he intended to deliver it to a third party. Moreover, he had sender's receipts from both the Maryland and District of Columbia boxes, and the jury heard testimony that he had traveled to Los Angeles around the time they were shipped. He was found with false identifications matching the names of the shipper and addressee of the Maryland box. The recipients of the District of Columbia box were also found with a notebook containing the names on Gibson's false identifications and an insurance card and a supermarket card issued in Gibson's own name as well as a napkin matching the address to which the Maryland box was delivered.[2] A reasonable jury could conclude beyond a rea-

[1] In his *pro se* brief, Gibson contends that the search warrant was issued ex post facto. Other than the fact that the warrant does not list the specific time at which it was signed, only a date, which is not improper under Fed. R. Crim. P. 41, Gibson presents no evidence to support this contention.

[2] To the extent that Gibson *pro se* challenges the search of Jones' apartment as well, he fails to articulate how his, as opposed

sonable doubt, on the evidence presented, that Gibson possessed and conspired to possess cocaine with the intent to distribute it.

Second, Gibson contends that the district court abused its discretion by admitting the identification by Braziel, the Federal Express employee in Los Angeles. According to the testifying agent, Braziel had stated during a photo array that the man in Gibson's photograph seemed familiar and may have been one of the people that actually shipped the boxes from the Federal Express office in Los Angeles. As Braziel's identifications at the lineup and at trial were the most direct evidence placing Gibson in Los Angeles on the day the two boxes were shipped, Gibson contends that admission of the identifications was more prejudicial than probative because of Braziel's lack of certainty at the initial photo lineup. *See* Fed. R. Evid. 403.

Absent constitutional error, the erroneous admission of evidence is harmless so long as it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *see also United States v. Powell*, 334 F.3d 42, 45–48 (D.C. Cir. 2003). In light of the strength of the government's other evidence connecting Gibson to the conspiracy, any error was harmless. *See, e.g., United States v. Bailey*, 319 F.3d 514, 519 (D.C. Cir. 2003). The conclusion that Gibson possessed cocaine with the intent to distribute was supported by the evidence of his involvement on the East Coast end of the alleged conspiracy, and does not require him to have been present in Los Angeles when the packages were shipped. Gibson's possession of the sender's receipts and false identifications bearing the shipper's and the addressee's names, as well as Doumbia's testimony that Gibson had gone to Los

to Jones', Fourth Amendment rights were violated. Co-conspirators enjoy no special exemption from the rule that defendants may not invoke the exclusionary rule vicariously. *See United States v. Padilla*, 508 U.S. 77, 81 (1993); *Alderman v. United States*, 394 U.S. 165, 171–76 (1969).

Angeles at the relevant time, independently connected Gibson to the shipments in any event.

Third, likewise without merit is Gibson's contention that reversal of his conviction is required because the district court abused its discretion in the manner and extent to which it investigated Gibson's complaints that a juror was making facial expressions indicating bias against him. Gibson, through counsel, twice requested that the juror be removed because Gibson believed she had already reached a decision in light of her facial expressions and general demeanor. After his second request, the district court responded that it had watched the challenged juror since Gibson's first complaint and had seen nothing to suggest the juror had made up her mind about Gibson's guilt or innocence. Gibson maintains that the court erred by failing to question the juror regarding her fairness.

District courts have wide latitude in choosing appropriate means of investigating claims of juror bias, and "[a]mong the factors [the district court] should consider are the strength and seriousness of the allegations," *United States v. White*, 116 F.3d 903, 929 (D.C. Cir. 1997) (per curiam). Interrupting a trial to question jurors about their fairness carries with it risks of placing undue emphasis on the challenged conduct, *see United States v. McVeigh*, 153 F.3d 1166, 1187 (10th Cir. 1998), and district courts, having first-hand observation of jurors and their demeanor, *see, e.g., United States v. Gartmon*, 146 F.3d 1015, 1029 (D.C. Cir. 1998), are in the best position to decide whether inappropriate conduct meriting an investigation has occurred, *see White*, 116 F.3d at 929. Defense "counsel's unsubstantiated suspicion" does not, on its own, require the district court to conduct jury questioning. *United States v. Thornton*, 746 F.2d 39, 50 (D.C. Cir. 1984).

Gibson relies on *United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976), where a district court refused to question a juror after his responses at voir dire reasonably called his objectivity into question. But Gibson presents no evidence that anything of the sort happened at his trial. On appeal, he points to no evidence, for instance, that the juror was making

inappropriate facial expressions, or that she ceased doing so during the period she was being watched by the district court. Absent any proffer to indicate that the district court's evaluation was inadequate, we have no basis on which to second-guess the decision that observing the juror, rather than interrogating her, was an appropriate way to investigate so generalized a claim of bias.[3]

### III.

Challenging the lawfulness of his sentence, Gibson contends that the lengthy delay between the date the jury returned its verdict and the date he was sentenced violated his Sixth Amendment right to speedy sentencing by leaving his life in limbo and in uncertainty. The plain text of the Sixth Amendment confers only "the right to a speedy and public trial," and does not expressly refer to sentencing. The Supreme Court has yet to hold that there is such a right although some circuits have done so.[4] In *Pollard v. United States*, 352 U.S. 354, 361 (1957), however, the Supreme Court "assume[d] arguendo that sentence is part of the trial for purposes of the Sixth Amendment." This court did likewise in *United States*

---

[3] The remainder of Gibson's *pro se* challenges, which we have carefully reviewed, also fail to demonstrate that his conviction should be reversed, essentially for reasons stated by the government in its brief. *See* Appellee's Br. at 45–54.

[4] The Third, Fifth, and Sixth Circuits have held the Sixth Amendment applicable to sentencing, *see United States v. Thomas*, 167 F.3d 299, 303–05 (6th Cir. 1999)*; United States v. Abou–Kassem*, 78 F.3d 161, 167 (5th Cir. 1996); *Burkett v. Cunningham*, 826 F.2d 1208, 1220 (3rd Cir. 1987). The Ninth Circuit stated in *Tinghitella v. California*, 718 F.2d 308, 312 (9th Cir. 1983), that the Sixth Amendment applies to sentencing, but the analysis in the case treats this statement as an assumption rather than a holding. *Id.* at 313. Several other circuits assume such a right exists. *See United States v. Nelson–Rogriguez*, 319 F.3d 12, 60 (1st Cir. 2003); *United States v. Rothrock*, 20 F.3d 709, 711 (7th Cir. 1994); *Perez v. Sullivan*, 793 F.3d 249, 252–57 (10th Cir. 1986); *Brady v. Superintendent, Anne Arundel County Detention Ctr.*, 443 F.2d 1307, 1310 (4th Cir. 1971).

*v. Yelverton*, 197 F.3d 531, 535–39 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 1195 (2000). As have other circuits, *see supra* n.4, the court in *Yelverton* reviewed the defendant's speedy-sentencing claim under the four-part test of *Barker v. Wingo*, 407 U.S. 514, 530 (1972), which looks to the "[l]ength of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant," *id.* We do so again. Assuming therefore without deciding that the guarantee of a "speedy and public trial," U.S. Const. amend. VI, also provides a defendant a right to be promptly sentenced, *accord Yelverton*, 197 F.3d at 535, we hold that Gibson has failed to make the showing under *Barker* necessary to obtain relief.

As to length, the jury returned its verdict on November 9, 1994, and the district court imposed sentence more than seven years later, on February 8, 2002. In the pre-trial context, delays exceeding a year are sufficient to invoke judicial scrutiny, *see Yelverton*, 197 F.3d at 537 n.8; *United States v. Lindsey*, 47 F.3d 440, 443 (D.C. Cir. 1995), *vacated on other grounds*, *Robinson v. United States*, 516 U.S. 1023 (1995). Even assuming that the different nature of the possible prejudice faced by defendants in the sentencing context might call for a more permissive standard before the delay can be considered "presumptively prejudicial," *cf. Barker*, 407 U.S. at 530, seven years clearly suffices to trigger judicial scrutiny under the first prong of *Barker*. The district court's discretion with regard to the time of sentencing is not without constraint, for Fed. R. Crim. P. 32(b) instructs that "[t]he court must impose sentence without unnecessary delay," *see Yelverton*, 197 F.3d at 535; *United States v. Campisi*, 583 F.2d 692, 693 (3rd Cir. 1978); *United States v. Flowers*, 983 F. Supp. 159, 167–71 (E.D.N.Y. 1997); *United States v. DeLuca*, 529 F. Supp. 351, 354–55 (S.D.N.Y. 1981). Gibson does not invoke the rule on appeal.

The reasons for the delay are mixed. Beginning in March 1995, Gibson filed several post-conviction motions attacking various aspects of his trial. After the district court ruled the motions untimely, Gibson's counsel requested multiple continuances to prepare for sentencing. Six months after the verdict date, the district court set a July 1996 sentencing

date, but at that point, because Gibson was dissatisfied with his attorney, the district court granted a continuance for Gibson to file his motions *pro se*. Gibson filed *pro se* motions in October 1996 and again in July 1997. Then, following staff turnover in the district court's chambers, an intern's work on Gibson's motions was lost, resulting in a 35–month delay. When, in June 2000, the district court resumed consideration of the case, it appointed new counsel for Gibson. In November 2000, six years after the verdict date, Gibson renewed his motions for a new trial. The district court ruled in February 2001 that the motions were untimely, and set an August 2001 sentencing date. This date passed without any action by the district court.

Gibson never asserted in the district court that he had a right to speedy sentencing. Instead, in October 2001, the district court *sua sponte* raised the question of whether Gibson's Sixth Amendment rights had been compromised and found no violation. The court pointed to Gibson's role in perpetuating the delay, the inadvertent nature of the delay attributable to the court itself, and the lack of prejudice to Gibson. The district court denied Gibson's renewed motions for a new trial, indicating that the court would move forward to sentencing. Even at this point, Gibson insisted that he was still interested in locating transcripts of the hearing at which he claimed the district court had granted him an extension of time to file his initial post-trial motions. The court granted the continuance to search for the transcripts, and ultimately imposed sentence on Gibson on February 8, 2002.

The only prejudice Gibson claims is having his life kept in "limbo and uncertainty." In *Barker*, the Supreme Court acknowledged that in the pre-trial context there is some prejudice from living under a "cloud of suspicion and anxiety," but that it is "minimal." 407 U.S. at 534. Similarly in a post-verdict, presentence context, "mere generalized anxiety" is not enough to show prejudice, *Yelverton*, 197 F.3d at 538 n.9, particularly where a defendant, as here, is serving a mandatory minimum term of imprisonment while awaiting sentencing. Although Gibson was incarcerated in a District

of Columbia facility throughout the presentencing period rather than in a federal correctional institution, Gibson makes no claim that the delay in sentencing deprived him of programmatic and other rehabilitative benefits for which he would be eligible as a federal prisoner in the custody of the Federal Bureau of Prisons. Moreover, as the United States advised during oral argument, Gibson's incarceration in the District of Columbia, rather than in a federal correctional institution, allowed him to be near his family.

What saves this court from confronting a difficult decision, including defining an appropriate remedy for a violation of a Sixth Amendment sentencing right, is Gibson's conduct throughout the period between verdict and sentencing and his failure to show any prejudice as a result of the delay. While the first *Barker* factor weighs heavily in Gibson's favor and the second factor weighs in his favor to the extent of the institutional delay, although less so as to the remaining delay, the other two factors weigh overwhelmingly against him. Gibson never asserted a right to speedy sentencing in the district court. Rather, he continually filed motions attacking his trial in order, effectively, to delay the imposition of sentence. Even when the district court set sentencing dates, Gibson persisted in seeking further delays. Nor does Gibson contend on appeal that the institutional delay of almost three years was the product of any abuse by the district court or the prosecutor's office. As the court stated in *Barker*, 407 U.S. at 531, delay caused by mere "negligence or crowded courts . . . should be considered," but "weighted less heavily" than "a deliberate attempt to delay . . . in order to hamper the defense." Finally, and importantly, Gibson shows no prejudice as a result of the delay, *cf. Yelverton*, 197 F.3d at 538, articulating no way in which he has been harmed by being sentenced seven years into a twenty-year sentence for an offense that carried a mandatory 10–year minimum, *see* 21 U.S.C. § 841(b)(1)(A); *see also* 18 U.S.C. § 3585(b)(1) (2003). An overview of the record reveals, therefore, that the extraordinary delay was exactly what Gibson wanted and continuously sought. Under the circumstances, Gibson fails to show a miscarriage of justice warranting relief.

### IV.

Gibson also contends that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), his sentence under 18 U.S.C. § 841(b)(1)(A) was unconstitutional because the district court, rather than the jury, determined the quantity of drugs for which he was responsible, which, in turn, affected the length of his sentence. This contention was rejected in *United States v. Graham*, 317 F.3d 262, 273–74 (D.C. Cir. 2003).

Under 28 U.S.C. § 841, maximum and minimum sentences vary based both on the quantity and type of drug involved. In *United States v. Fields*, 242 F.3d 393, 395–96 (D.C. Cir. 2001), the court explained that *Apprendi* prohibits the sentencing judge from being the finder of fact with regard to the relevant drug quantity under 21 U.S.C. § 841 where the result is a higher sentence than would have been possible under the jury's findings. Specifically, where a jury has only found that a defendant possessed a "detectable amount" of drugs, as here, it is clear error for the district court to make a quantity finding on its own that leads to the imposition of a sentence higher than the maximum permitted under the jury's findings. *Id.* On rehearing, the court explained that "*Apprendi* does not apply to sentencing findings that elevate a defendant's sentence *within* the applicable statutory limits." *United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001) (emphasis in original). In *United States v. Webb*, 255 F.3d 890, 896–99 (D.C. Cir. 2001), the court recognized that because § 841 is a tripartite statute that establishes separate offenses based on drug quantity, drug quantity is an element of the offense under § 841(b)(1)(A) and (b)(1)(B) and must be submitted to the jury. Failure to do so, however, is not plain error so long as the defendant is sentenced within the range authorized by § 841(b)(1)(C), *id.* at 898, and is harmless under those circumstances, *see Graham*, 317 F.3d at 273–74. This is precisely what happened to Gibson.

At sentencing, the district court recognized, in light of the cases decided since the jury's verdict, that, although it determined that the quantity of cocaine involved was 6.9 kilograms, its discretion to sentence Gibson under § 841(b)(1)(A) was

limited. Even though the relevant sentencing guidelines made Gibson eligible for a punishment range between 210 and 262 months under § 841(b)(1)(A), the jury, whose verdict was issued prior to *Fields* and *Webb*, was not instructed to make a quantity finding and found only that Gibson had possessed a "detectable or measurable amount of cocaine" with the intent to distribute. *Apprendi*, also decided subsequent to the jury's verdict, thus prohibited the imposition of any sentence greater than 240 months, the maximum statutory penalty to which Gibson could have been sentenced under § 841(b)(1)(C). On February 8, 2002, the district court therefore imposed the statutory maximum of 240 months on both the possession and conspiracy counts, running concurrently. This was a permissible approach under *Graham*, 317 F.3d at 273–74.

Accordingly, we affirm the judgment of conviction.